## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA**

**v.**                                    **Criminal No. 2:12-00085**

**DIANE E. SHAFER, M. D.**


## DEFENDANT'S SENTENCING MEMORANDUM

**COMES NOW** the Defendant, Diane E. Shafer, M.D., by her counsel, Dwane L. Tinsley, and submits this Sentencing Memorandum outlining the following 18 U.S.C. Section 3553(a) factors for the Court's consideration at her September 18, 2012, sentencing hearing.

Dr. Shafer's guidelines are calculated in the presentence report at a total offense level of 6, criminal history category I, resulting in a guideline imprisonment range of 0 to 6 months. Dr. Shafer asserts that are factors that warrant sentencing her to a sentence alternative suggested by U. S. S. G. Section 5C1.1(b). Based upon those factors, set out below, Dr. Shafer respectfully asks this Court to sentence her to a term of probation.

I.      **FACTUAL BACKGROUND**

On April 9, 2012, Diane E. Shafer signed a written plea agreement and consented to the filing of a one-count information to be filed in the United States District Court for the Southern District of West Virginia charging her with conspiracy to misuse DEA registration number in violation of 21 U.S.C. Section 846.

On May 23, 2012, Diane E. Shafer appeared before this Honorable Court and entered a guilty plea to a one-count information charging her with conspiracy to misuse DEA registration number in violation of 21 U.S.C. Section 846 in accordance with the written plea agreement. Dr. Shafer was then released on a $10,000.00 unsecured bond and placed under the supervision of

the United States Probation Office.  Because Dr. Shafer was living with her mother in

Paintsville, Kentucky, she was under the supervision of the United States Probation Office in

Pikeville, Kentucky.  She has been under supervision since her release and has remained in full

compliance with the conditions of her bond.  Dr. Shafer has accepted responsibility for her

conduct and cooperated fully with federal authorities.  She is awaiting sentencing, which is

currently scheduled for September 18, 2012.

## II.    GUIDELINE ANALYSIS

The presentence report was prepared on August 6, 2012, indicating a base offense level

of eight (8) pursuant to U.S.S.G. Section 2D3.1 and U.S.S.G. Section 3b1.3.  Pursuant to the

criteria set forth in U.S.S.G. Section 3E1.1 (a), Dr. Shafer's offense level was adjusted

downward by two (2) levels.  As a result, the adjusted total offense level has been calculated at a

guideline level of six (6).  In sum, and pursuant to U.S.S.G. Chapter 5, Part A, based on a total

offense level of six (6) and a criminal history category of I, the guideline range for imprisonment

is 0 to 6 months.  Dr. Shafer has reviewed the presentence report and has filed several objections,

but agrees that the offense level has been properly calculated.

The government has not filed any objections or corrections to the presentence report.  At

the time of sentencing, Dr. Shafer, through counsel, will respectfully request this Honorable

Court to impose a sentence of probation in this matter.

## III.    SENTENCING FACTORS TO CONSIDER

Pursuant to the statutory mandate of 18 U.S.C. 3553(a), the Court shall impose a sentence

sufficient, but not greater than necessary (emphasis added), to comply with the purpose set forth

in paragraph (2) of this subsection.  The Court, in determining the particular sentence to be

imposed, shall consider:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed --

   (A)     to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;

   (B)     to afford adequate deterrence to criminal conduct;

   (C)     to protect the public from further crimes of the defendant; and

   (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentences and the sentencing range established for --

   (A)     the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; or

   (B)     in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994 (a)(3) of Title 28, United States Code, taking into account any amendments made to such guidelines or Policy statement by act of Congress (regardless of whether such Amendments have yet to be incorporated by the Sentencing Commission into amendments issued under Section 994(p) of Title 28);

(5)     any pertinent policy statement;

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(7)     the need to provide restitution to any victims of the offense.

In considering the guidelines, certain problems exist regarding the inability to statistically quantify that the sentencing guidelines, in their present or historical forms are achieving, or have achieved, their intended purposes.  In addition, there is some concern whether the statutory goals of sentencing can be quantified.  For instance, we cannot measure or quantify the inherent seriousness of any particular offense other than its perceived impact to any victim(s) and its

3

perceived seriousness relative to other offenses. Congress and policy makers have attempted to assign degrees of relative seriousness through systematic research which resulted in the sentencing guidelines. In the Sentencing Commission's quarterly and annual reports, sentencing data is presented for several Primary Offense Categories, ranging from the most serious, i.e. murder, to various less serious offenses.[1] In this case, the defendant's offense falls in the category of Food and Drug offenses. The Sentencing Commission's Guideline Manual reflects the Commission's position that Dr. Shafer's offense is one of the least serious offenses, relative to other offenses, by treating it as a regulatory violation and assigning a base offense level of 6 U.S.S.G. Section 2D3.1.

Promoting respect for the law and providing just punishment also present inherent problems with empirical measurement. The issue again becomes primarily one of perception, both public and individually. In essence, Congress has issued the Courts the challenge of shaping the public's perception of criminal sentencing in individual cases with the intent of enhancing the public's respect for the law. One underlying assumption inherent in that goal is that an inverse relationship should exist between respect for the law and crime rates in general. That is, as respect for the law increases, crime conversely should decrease. According to Gallup, a nationally recognized polling organization specializing in public policy issues, the public's perception regarding crime in general is influenced by the media.[2] A Gallup report released in October, 2011, indicated that the public's perception of crime trends in general have remained negative over a period of several years regardless of the fact that crime rates nationally began

---

[1] Source: U.S. Sentencing Commission, Preliminary 2012 Datafile, USSCFY12 (October 1, 2011 through March 31, 2012).
[2] Lydia Saad, "Most Americans Believe Crime in America is Worsening;" Gallup Report, Princeton, N.J., October 31, 2011.

steadily decreasing in the mid-1990s and have remained relatively stable since.[3]  The report

concludes that regardless of the difference in data collection methods used by the FBI's Uniform

Crime Reports (which rely on reporting by police agencies) and the Department of Justice's

Bureau of Justice Statistics (which rely on large nationally representative public surveys), public

opinion regarding crime in general may be out of sync with reality.[4]  From a sentencing

perspective, the public in general believes that Courts are too lenient in sentencing until the

defendant becomes personalized, that is, someone they know.  That perception changes little

over time or jurisdictions leaving the impression that courts can do little to impact the public's

perception of crime.[5]  While sentencing practices and trends for different types of offenses and

offenders across different jurisdictions can be analyzed with great accuracy, we can do little to

measure with any degree of certainty how sentencing practices impact the public's respect for the

law.

       The task for the Court therefore becomes primarily one of imposing a just and rational

sentence based on the defendant's need and attitude regarding her willingness to understand and

accept the breach she committed, the degree of society's need for retribution and the resources

required to adequately punish the offender for her offense.  Dr. Shafer continues to accept full

responsibility for her conduct and has in fact been humbled by this experience.  In an effort to

display her respect not only for the criminal law, but also for the administrative laws governing

her profession, she voluntarily relinquished her DEA registration number and medical license

prior to entering into her plea agreement with the government.  When considering just

punishment that is sufficient, but not greater than necessary to achieve the purposes set forth, the

Court is faced with imposing punishment that will satisfy societal needs in a fashion that does

---

[3] Ibid.
[4] Ibid.
[5] Julian V. Roberts and Mike Hough, "Understanding Public Attitudes to Criminal Justice," McGraw-Hill, 2005.

not become overly burdensome financially or otherwise and one that does not create unwarranted hardship on the defendant and her family.  Regarding societal concerns, Dr. Shafer has closed her practice and has agreed not to re-apply for a DEA registration number.  In addition, she has agreed to a significant forfeiture that represents the gains of her conduct.  Imposing a sentence of probation would satisfy the needs of society, as well as the goals of punishment, in a manner that would not place unwarranted hardship on the defendant or unwarranted costs upon the taxpayers.

If a term of incarceration within the Commission's guidelines is imposed as the primary sentence, or as a condition of supervision, the defendant is likely to serve that time in a local Bureau of Prisons or U. S. Marshall contract facility in West Virginia or Kentucky.  According to a Vera Institute of Justice study released in July 2012, the taxpayer cost of imprisonment per inmate annually in West Virginia and Kentucky is $26,498.00 and $14,603.00 respectively.[6] That translates to average costs of $4,416.00 and $2,434.00 respectively, for a two-month period of incarceration and $2,208.00 and $1,217.00 for a one-month period.  The impact of incarceration on crime rates is surprisingly small and must be weighed against both its high monetary costs to governments and its high social costs to prisoners, their families and their communities.[7]

Regarding this defendant, a sentence of probation, possibly with home confinement, satisfies the need for just punishment that is sufficient, but not greater than necessary, to achieve the goals of sentencing.  In determining the length of any home confinement term, the defendant's personal circumstances, including her age, medical condition and the fact she is her mother's primary caregiver, should factor into the decision.  A 1981 study conducted by Austin

---

[6] Source: Vera Institute of Justice, "The Price of Prisons: What Incarceration Costs Taxpayers," (Updated July 2012)
[7] Don Sternen, Andres Rengifo and James Q. Wilson, "Of Fragmentation and Ferment: The Impact of Sentencing Policies on Incarceration Rates," Vera Institute of Justice study funded by National Institute of Justice, U.S. Dept. of Justice, (2006).

and Krisberg (National Council on Crime and Delinquency), that is still relevant today, should be considered in imposing home confinement or in imposing any alternative sentence or special condition for that matter.[8]  This study addressed the concept of creating wider, stronger and different nets of social control through the various types of alternative sentencing, conditions and programming imposed upon defendants under the laudable goal of treatment.  This was done in an attempt to reduce the associated problems of jail and prison overcrowding.  The result of their work basically points out that while alternative sentencing with special conditions and programs are essential from both rehabilitative and administrative standpoints, they tend to be viewed as panaceas that are relied upon too heavily or inappropriately, thereby creating more and stronger nets of control and possibly exposing offenders to future increased punishments when their imposition was unnecessary to achieve compliance as well as other goals of sentencing.[9]  Congress adopted this approach in 18 U.S.C. Section 3563(b) in granting courts the authority to impose discretionary conditions of probation to the extent that such conditions are reasonably related to factors set forth in Section 3553(a)(2), but only to the extent that such condition involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in Section 3553(a)(2).  The statute goes on to delineate twenty-three discretionary conditions the court may consider when imposing a sentence of probation.  In this case, the Court should consider the following discretionary conditions:

>  (5)    refrain, in the case of an individual, from engaging in a specified occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in such a specified occupation, business, or profession only to a stated degree or under stated circumstances;

>  (8)    refrain from possessing a firearm, destructive device, or other dangerous weapon;

---

[8] James Austin and Barry Krisberg, "Wider, Stronger and Different Nets: The Dialectics of Criminal Justice Reform," (National Council on Crime and Deliquency, Hackensack, N.J.), 1981.
[9] Ibid.

(12)    work in community service as directed by the court;

(15)    report to a probation officer as directed by the court or the probation officer;

(16)    permit a probation officer to visit her at her home or elsewhere as specified by the court;

(17)    answer inquiries by a probation officer and notify the probation officer promptly of any change in address or employment;

(18)    notify the probation officer promptly if arrested or questioned by a law enforcement officer.

In addition to the above mentioned conditions, the Court should also consider the mandatory conditions listed in 18 U.S.C. Section 3563(a).

The Section 3553(a)(2)(B)&(C) goals of affording adequate deterrence to criminal conduct and protecting the public from further crimes of the defendant refer to both specific and general deterrence and recidivistic behavior by the defendant.  Again, general deterrence to criminal conduct is difficult, if not impossible to quantify.  Even when crime rates decline, a statistical significance cannot be attributed to whether a deterrent effect was achieved through criminal sentencing practices, some other public policy, economic fluctuations, or any number of other variables.[10]  A marginal statistically correlation, however, has been shown regarding the perceived certainty of apprehension, prosecution and conviction, rather than severity or types of statutory punishments available or the actual punishment imposed.[11]

Regarding specific deterrence and this offender's likelihood to recidivate (to protect the public from further crimes of the defendant), the United States Sentencing Commission's published research indicates the defendant falls into a comprehensive demographic that

---

[10] Andrew von Hirsch, Anthony E. Bottoms, Elizabeth Burney, and PO Wikstrom, "Criminal Deterrence and Sentencing Severity: An Analysis of Research," Hart Publishing, 1999.
[11] Ibid.  (See also Valerie Wright, Deterrence in Criminal Justice; Evaluating Certainty v. Severity of Punishment"). The Sentencing Project Washington, DC November 2010.

represents the least likelihood of recidivism (Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines; Research Series On The Recidivism Of Federal Guideline Offenders, United States Sentencing Commission, May 2004).  The report indicates that:

1.  Gender:  overall, women are less likely to recidivate than men;

2.  Age at Sentence:  offenders over the age of 50 at sentencing are the least likely to re-offend than any younger age group;

3.  Race and Ethnicity:  white offenders are least likely to recidivate;

4.  Employment Status:  offenders with stable employment in the year prior to their Instant offense are less likely to recidivate;

5.  Educational Attainment:  offenders with college degrees are less likely to recidivate;

6.  Marital Status:  offenders who have been married, even if divorced, are less likely to re-offend than offenders who have never married;

7.  Illicit Drug Use:  offenders not using illicit drugs within one year prior to their offense are less likely to recidivate than those who were.

The Commission's report also points out an obvious correlation – the lower the criminal history points, statistically, the less likelihood of re-offending.  The defendant's lack of any criminal history points, along with the fact that she falls into practically every category having a statistically significant correlation for not re-offending, provides the best available predictive analysis for both protecting the public from further crimes and affording adequate deterrence to criminal conduct.

The Court must consider the requirement of 18 U.S.C. Section 3553(a)(2)(D), which states, to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  The defendant's educational background and training achievements are well documented in the presentence report as are her

medical requirements.  The defendant's medical care can best be addressed by placing her on

probation and allowing her to continue her required medical care and medications at her own

expense.  In addition, 18 U.S.C. Section 3582(a) recognizes that imprisonment is not an

appropriate means of promoting correction and rehabilitation.

The Court must also consider the need to avoid unwarranted sentencing disparities among

defendants with similar records who have been found guilty of similar conduct. 18 U.S.C.

Section 3553(a)(6).  Having concluded that the "medical model" or the "rehabilitative ideal" was

not achieving its intended purposes and that public sentiment overwhelming no longer favored

that approach, Congress enacted a "just deserts" approach toward sentencing through the

Sentencing Reform Act of 1984.  The Sentencing Commission was created and its resulting

guidelines were developed primarily to provide truth in sentencing, reduce sentencing disparity

among similarly situated defendants who committed similar types of offenses and provide just

punishment by sentencing any given defendant to exactly what he or she deserved, no more or no

less.  Achieving this goal is not a frivolous undertaking, for critics correctly point out that equal

sentencing frequently results in unequal justice.  The salient factors utilized by the Commission

in achieving their purposes are the Criminal History Category and the Offense Conduct, both

derived through numerical assessments that render the "just" sentencing range.  Certain societal

and individual orientations or characteristics had no relevance in the guideline scheme.  Prior to

the guidelines, other considerations took precedence such as the individual offender's personal

history and personal circumstances.  The United States Senate, in declaring its sense of what

sentencing should encompass, issued the following declaration in October, 1984.  Section 239 of

Public Law 98-473, Title II, c. II, October 12, 1984, 98 Stat. 2039, provided (see Appendix B-

Selected Sentencing Statutes, page 5, of U. S. Sentencing Commission's November 1, 2011

guidelines):

        Since, due to an impending crisis in prison over-crowding, available Federal prison space must be treated as a scarce resource in the sentencing of criminal defendant;

        Since, sentencing decisions should be designed to ensure that prison resources are first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society;

        Since, in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service;

        Since, in the two years preceding the enactment of sentencing guidelines, Federal sentencing practices should ensure that scarce prison resources are available to house violent and serious criminal offenders by the increased use of restitution, community service and other alternative sentences in cases of nonviolent and nonserious offenders:  Now, therefore, be it

        Declared, That it is the sense of the Senate that in two years preceding the enactment of the sentencing guidelines, Federal Judges, in determining the particular sentence to be imposed, consider –

        1.      the nature and circumstance of the offense and the history and characteristics of the Defendant (emphasis added);

        2.      the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant has not been convicted of a crime of violence or otherwise serious offense; and

        3.      the general appropriateness of imposing a sentence of imprisonment in cases in which the defendant has been convicted of a crime of violence or otherwise serious offense.

Surely, defendants such as Dr. Shafer are who the Senate had in mind regarding the use of alternatives such as community service as opposed to using otherwise scarce resources for custody sentences.

If a period of probation is imposed, the Court can be assured that it has avoided an unwarranted sentencing disparity with defendants who have been found guilty of similar conduct.

The Administrative Office of the United States Courts Annual Report, <u>Justice Business of the United States Courts: 2011 Annual Report of the Director</u>, indicates that during the twelve-month period ending September 30, 2011, a total of 56 defendants nationwide were sentenced for similar Regulatory Food and Drug offenses.  A total of 36 defendants received probation representing 64% of that population, while 9 were sentenced to some term of imprisonment, representing only 16%.  Eleven (11) defendants, or 20%, received only a fine without any imprisonment or supervision.[12]  The trend for the preceding fiscal year 2010 was very similar in that 69% of offenders convicted in this category received probation (59 of 85), 20% received some term of imprisonment (17) and 11% (9) received a fine.[13]

## IV.    THE NEED FOR THE SENTENCE IMPOSED

A sentence of probation in this case promotes respect for the law, protects the public and deters criminal conduct.  Dr. Shafer could adequately be supervised on probation without other unnecessary and overly restrictive conditions, including home confinement, intermittent or community confinement, drug testing, warrantless searches and restrictions on her travel.  Dr. Shafer has indicated her willingness to complete a period of community service utilizing her skills and talents in a manner that is beneficial to other, less fortunate citizens, within the Southern District of West Virginia.  The Administration at West Virginia Health Right Clinic has agreed to accept Dr. Shafer for community service work should the Court so order.  Dr. Shafer

[12] Source: Administrative Office of the U.S. Courts: 2011 Annual Report of the Director, Table D-5, pages 234 and 238; November 2011.
[13] Source:  Administrative Office in the U.S. Courts:  2010 Annual Report of the Director, Table D-5, pages 246 and 250; November 2010.

would begin by helping organize files and assisting with data collection and entry. After an unspecified acquaintance and orientation period, the Administration envisions utilizing her skills in conducting group and individual educational classes. A sentence of probation fashioned in this manner would best serve the interest of justice and the goals of sentencing while providing a needed service to the citizens of West Virginia.

Dr. Shafer has accepted full responsibility for her conduct and recognizes that in committing this offense, at some level, society and the law itself become victims of her breach in moral and legal conduct. In addition to her forfeiture agreement, Dr. Shafer would request that she be allowed to give back or repair the breach by being place on probation and allowed to perform the previously suggested community service.

As accurately reflected in the presentence report, Dr. Shafer's 81 year old mother has been in declining health since 2007 when she suffered a stroke. As a result, her mother suffers from forgetfulness and hemiparesis, a form of paralysis. In 2008, Dr. Shafer began traveling between her home in South Williamson, Kentucky and her mother's residence in Paintsville, Kentucky to look after her. This is a sixty-mile trip one way and takes approximately an hour and a half to drive. On average, Dr. Shafer would spend four evenings a week with her mother, driving to her office the following morning. Dr. Shafer decided to retire from her medical practice in December 2009 and move in with her mother as her primary care-giver. Dr. Shafer assists her mother with virtually all aspects of daily living including feeding, bathing, dressing, administering medication and household chores. Not only does Dr. Shafer's presence in her mother's home contribute to her care and well-being in the form of a loving daughter-mother relationship, but also as a trained medical professional which provides an advantage not usually available to aging parents. The responsibilities of caring for an aging and declining health parent

13

can weigh heavily on a child.  Dr. Shafer is the only family member available to provide the

required care needed by her mother.    A sentence of probation will allow Dr. Shafer to continue

to care for her mother.  We will call a witness who has training and experience in home health

care to testify at the sentencing hearing about the unique role Dr. Shafer can serve as her

mother's care-giver and how such care will significantly improve her mother's quality of life.

Dr. Shafer also has personal medical issues that the Court should consider in imposing

sentence.  As reflected in the presentence report, she suffers from "significant asthma" and takes

medication daily including Proventil, Albuterol, Singular, Intal, Servant, Zyrtec, Prednisone and

Solu-Medral.  If sentenced to a period of incarceration or intermittent in a jail, community-based

or Bureau of Prisons Facility, the onerous would be upon the government, financially and

administratively, to provide and administer the medications on a daily basis.  It is requested that

the Court consider Dr. Shafer's positive contribution to her community over the years including

her volunteer work training young people in first aid and beautification projects in her town as

reflected in the letters of support on behalf of Dr. Shafer.

## V.    SENTENCE PROPOSED

The Court is statutorily required to consider the kinds of sentences available and the

Sentencing Commission's guidelines, pertinent policy statements and 18 U.S.C. Section (a)(3),

(4) and (5).  Should the Court accept the guideline applications and calculations set forth in the

presentence report, Dr. Shafer falls into Zone A of the Sentencing Table and is therefore eligible

for probation.

Based upon all of the information contained in this Memorandum, Dr. Shafer can

adequately be supervised on probation without the overly restrictive conditions of community,

intermittent or home confinement.  Probation with the proposed community service, but without

the more restrictive, unwarranted conditions previously outlined, would comport with the sentencing guidelines as currently calculated and satisfy all of the statutory goals of sentencing. Based on the evidence presented, the Court can feel confident in imposing a non-custody sentence based on historical practice, the Sentencing Reform Act, the Sentencing Commission's own research and other credible research.

In the event the Court believes that a sentence of imprisonment should be imposed, 18 U.S.C. Section 3583(a) provides, "the Court in imposing a sentence to a term of incarceration for a felony or misdemeanor may (emphasis added) include as part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment, unless otherwise required by statute." The defendant's offense of conviction does not statutorily require a term of supervised release. If the Court is inclined to impose any term of incarceration, that imprisonment in itself would adequately satisfy all of the purposes of sentencing enumerated at 18 U.S.C. Section 3553(a) and any period of supervised release would be unnecessary for the reason stated in this Memorandum.

Wherefore, the defendant, Diane E. Shafer, M.D., based on the foregoing reasons, is an excellent candidate for probation as suggested in this Sentencing Memorandum. When considering the various options that are available to this Court, the circumstances of this case and the benefits Dr. Shafer can provide to her elderly mother and the community as opposed to incarceration, probation is appropriate in this case.

Respectfully submitted,

DIANE E. SHAFER, M.D.,

By Counsel,

/s/ Dwane L. Tinsley, Esquire

West Virginia State Bar #3767

**Hendrickson & Long, PLLC**

214 Capitol Street

Charleston, West Virginia  25301

Phone:  (304) 346-5500

Telefax: (304) 346-5515

dtinsley@handl.com

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA**

**v.**                                    **Criminal No. 2:12-00085**

**DIANE E. SHAFER, M. D.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 7, 2012, I served the foregoing **Defendant's**

**Sentencing Memorandum** with the Court using CM/ECF which will automatically serve all

electronic filers.

> John J. Frail
> Assistant United States Attorney
> United States Attorney
> Southern District of West Virginia
> Robert C. Byrd United States Courthouse
> 300 Virginia Street, East, Suite 4000
> Charleston, West Virginia  25301
> John.Frail@usdoj.gov

> /s/ Dwane L. Tinsley, Esquire_____
> West Virginia State Bar #3767
> **Hendrickson & Long, PLLC**
> 214 Capitol Street
> Charleston, West Virginia  25301
> Phone:  (304) 346-5500
> Fax:  (304) 346-5515
> dtinsley@handl.com